In re ENRON CORP., et al.,
Reorganized Debtors.

Enron Corp., Plaintiff,

v.

International Finance Corp.,
et al., Defendants.

Bankruptcy No. 01 B 16034(AJG).
Adversary No. 03–93370 A.

United States Bankruptcy Court,
S.D. New York.

May 2, 2006.

Togut, Segal & Segal, LLP, by Albert Togut, Esq., (Howard P. Magaliff, Esq., Frank A. Oswald, Esq., of Counsel), New York, NY, Counsel for the Debtors.

Kramer Levin Naftalis & Frankel LLP, by Barry H. Berke, Esq., (Stephen M. Sinaiko, Esq., Jonathan A. Popolow, Esq., of Counsel), New York, NY, Counsel for Bear, Stearns & Co., Inc.

Strook & Strook & Lavan LLP, by Brian M. Cogan, Esq., (Michellet Schott, Esq., of Counsel), New York, NY, Counsel for Protective Life Corporation.

Maynard, Cooper & Gale, P.C., by Katharine A. Weber, Esq., of Counsel, Birmingham, AL, Counsel for Protective Life Corporation.

Stempel Bennett Claman & Hochberg P.C., by David G. Tobias, Esq., of Counsel, New York, NY, Counsel for Natexis Banque Populaires.

Bressler, Amery & Ross P.C., by David H. Pikus, Esq., of Counsel, New York, NY, Counsel for Ensign Peak Advisors.

Kirton & McConkie, P.C., by Eric C. Olson, Esq., of Counsel, Salt Lake City, UT, Counsel for Ensign Peak Advisors.

Swartz Campbell LLC, by Curtis P. Cheyney, III, Esq., (John A. Wetzel, Esq., of Counsel), West Chester, PA, Counsel for Nationwide Life Insurance Company.

Chadbourne & Parke LLP, by N. Theodore Zink, Jr., Esq., (Francisco Vazquez, Esq., Gregory J. Kerr, Esq., of Counsel), New York, NY, Counsel for Dexia Bank f/k/a Artesia Banking Corporation N.V.

## OPINION GRANTING DEFENDANTS' MOTIONS TO DISMISS COMPLAINT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Before the Court are several motions filed by the defendants in the above captioned adversary proceeding, seeking to dismiss, pursuant to FED.R.CIV.P. 12(b)(6), the complaint (the "Complaint") as filed against them by Enron Corporation ("Enron"). Pursuant to various stipulations and orders entered by the Court, certain of the defendants have been dismissed from the adversary proceeding. This Opinion addresses the motions filed by Bear, Stearns & Co., Inc. ("Bear, Stearns"), Ensign Peak Advisors ("Ensign Peak"), Natexis Banques Populaires ("Natexis"), Dexia Bank ("Dexia"), Nationwide Life Insurance Co. ("Nationwide") and Protective Life Corporation ("Protective Life") (collectively, the "Defendants").[1]

FED.R.CIV.P. 12(b)(6) is incorporated into bankruptcy procedure by FED. R. BANKR.P.

---

1. Motions to Dismiss filed by defendants Caisse de Depot et Placement du Quebec and National Australia Bank concern other theories which are not addressed in this Opinion.

Rather, those issues will be addressed in a separate Opinion that is being issued by the Court.

7012(b). In considering a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Id.*

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 106 S.Ct. 2932, 2944 92 L.Ed.2d 209 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). Pursuant to Fed.R.Civ.P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr.P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id.,* 355 U.S. at 47–48, 78 S.Ct. at 103. Based upon the liberal pleading standard established by Fed. R.Civ.P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id.*

In reviewing a Fed.R.Civ.P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken, *Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Indus. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, a court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Fed.R.Evid. 201. *In re Merrill Lynch & Co., Inc.,* 273

F.Supp.2d 351, 357 (S.D.N.Y.2003), *citing, Chambers,* 282 F.3d at 153.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Thus, for the purposes of the motions to dismiss, the Court accepts as true all of the material allegations in the Complaint filed by Enron. As such, most of the following facts are taken from the Complaint and accepted as true solely for the purposes of the motions to dismiss.

### FACTS

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron and certain of its affiliated entities (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

Prior to filing for bankruptcy protection, in approximately December 1999, Enron monetized a portfolio of loan facilities owned by Enron North America Corp. ("ENA") and certain other Enron affiliates in a transaction known as a "collateralized loan obligation" ("CLO"). In connection with the CLO transaction, several entities were formed, including a limited partnership, ENA CLO I Holding Company I L.P. ("CLO Holding"), and a trust, ENA CLO I Trust (the "CLO Trust"). As part of the CLO transaction, the contents of the portfolio of loan facilities were transferred to CLO Holding. The CLO Trust issued several classes of notes with maturities in 2014 (the "CLO Notes"). The proceeds of the CLO Notes were used to purchase the sole limited partnership interest in CLO Holding. Security for the CLO Notes was provided by CLO Trust's limited partnership interest in CLO Holding, without recourse to CLO Trust or any other entity. Thus, the source of funds from which the CLO Trust could make payments to holders of the CLO Notes was CLO Holding. Repayment of the CLO Notes was dependent upon payment to CLO Holding by the obligors of the collateralized loans included in the portfolio of loan facilities.

In 2000, the value of CLO Holding's portfolio of loan facilities declined and in September 2000, Enron provided credit support for the Notes by granting a put option to CLO Holding. Pursuant to the put option, Enron was obligated to purchase from CLO Holding up to $113 million in defaulted portfolio loans. In December 2000, and again in June 2001, CLO Holding exercised its rights pursuant to the put option. CLO Holding transferred the funds received as a result of exercising the put option to the CLO Trust. In turn, the CLO Trust transferred the funds (the "Put Transfers") it received from the exercises of the put option to certain holders of CLO Notes via an account at Chase Manhattan Bank ("Chase"). In exchange, those holders of CLO Notes who received Put Transfers transferred their CLO Notes to Enron through accounts at Chase.

The portfolio of loan facilities continued to decline in value as a result of payment defaults on the underlying loans. In spring 2001, Enron purchased all of the then-outstanding CLO Notes from certain of the Defendants at face value plus accrued interest. Thus, the price Enron

paid to purchase the CLO Notes was above market value. Specifically, on May 1, 2001 and May 3, 2001, Enron made certain transfers by wire to Chase, as indenture trustee for the benefit of holders of CLO Notes. On those same dates, Chase made transfers (the "May Transfers" and together with the Put Transfers, the "Transfers") to certain of the Defendants and, in exchange, those Defendants transferred their CLO Notes to Enron or ENA. The CLO Notes were transferred by the Defendants through accounts at Bear, Stearns and/or Bear, Stearns Security Corporation ("BSSC").

Enron commenced this adversary proceeding seeking to avoid and recover the Transfers. In Count I of the Complaint, Enron alleges that the May Transfers are avoidable as constructive fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable under section 550(a)(1)(B). In Count II of the Complaint, Enron alleges that the Put Transfers are avoidable as constructive fraudulent transfers, pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and recoverable from certain of the Defendants as mediate transferees pursuant to section 550(a)(2).[2] In Count III of the Complaint, Enron seeks disallowance, pursuant to section 502(d) of the Bankruptcy Code, of any other claims against the Debtors asserted by the Defendants, as recipients of avoidable transfers.

The Defendants filed their Motions to Dismiss in which they seek to dismiss Counts I and II, the fraudulent conveyance counts, and allege that, as a matter of law, the safe harbor of 11 U.S.C. § 546(e) protects the Transfers from avoidance. In addition, the Defendants argue that because the avoidance claims fail, therefore, Count III of the complaint seeking disallowance, pursuant to 11 U.S.C. § 502(d), of any other claims of the Defendants against the Debtors also must be dismissed as that count is derivative of and dependent upon the viability of the claims based upon avoidance.

Enron opposes the motions to dismiss the Complaint, arguing that evidence is required on whether the transfers are protected by the safe harbor of section 546 of the Bankruptcy Code.[3]

A hearing on this matter was held before the Court on April 10, 2006.

## DISCUSSION

### The Safe Harbor Provisions

Section 546 of the Bankruptcy Code provides a "safe harbor" for certain types of transactions. The purpose of section 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.)*, 913 F.2d 846,

---

**2.** With respect to the motions to dismiss at issue in this Opinion, Count II of the Complaint is only relevant to Dexia Bank as no recovery based on that count is sought from the other Defendants.

**3.** Enron also argues that the Defendants cannot assert the affirmative defense of the protection of the 11 U.S.C. § 546 safe harbor in the context of a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6). However, as this Court previously determined, in instances where "a Rule 12(b)(6) motion raises an affir-

mative defense that appears on the face of the complaint, the complaint can be dismissed." *See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 870 (Bankr. S.D.N.Y.2005), citing, *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.2003). Here, based upon the allegations of the Complaint and other material which the Court may consider, it can determine, as a matter of law, the application of the safe harbor provisions.

848 (10th Cir.1990) (hereinafter, *"Kaiser I"*).

The routine purchase and sale of a security includes two opportunities for settlement, "street-side settlement" between the brokers and the clearing agencies and "customer-side settlement" between the broker and its customer. *See Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1237–38 (10th Cir.1991) (hereinafter *"Kaiser II"*). The proper functioning of the system depends on the "guarantees of performance made by all the parties in the chain affirming that they will honor their obligations despite a default by another party in the system." *See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 476 n. 47 (S.D.N.Y.2001).

In the securities industry, "any transfer of cash or securities made to complete a securities transaction is considered a settlement payment." *Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*, 261 B.R. 150, 154 (Bankr.W.D.Pa.2001). A settlement payment is a payment made to discharge a settlement obligation. *Kaiser II*, 952 F.2d at 1238 (citing Division of Market Regulation, Securities and Exchange Commission, *The October 1987 Market Break* at 10–5 (1988) (SEC Report)).

▮ In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of these settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A) of the Bankruptcy Code. *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y.2001). If settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. *Id.* The purpose of

section 546(e) of the Bankruptcy Code was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 353 (N.D.Tex.1996) (quoting, H. Rep. No. 420, 97th Cong.2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583).

When first enacted, section 546 of the Bankruptcy Code only applied to the commodities market; however, in 1982, its scope was expanded to protect the securities market. *Kaiser I*, 913 F.2d at 848–49. Section 546(e) of the Bankruptcy Code provides that

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Thus, section 546(e) provides a safe harbor for settlement payments. In connection with the securities trade, "settlement payment" is defined in section 741(8) of the Bankruptcy Code, which provides that:

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).

In *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857,

865 (Bankr.S.D.N.Y.2005), this Court considered the arguments concerning the breadth of the term "settlement payment" and concluded that because the definition merely lists types of settlement payments, the reference in section 741(8) to "or any other similar payment commonly used in the securities trade" provided a basis upon which to get around the circularity of the definition and discern the meaning of the term "settlement payment." *Id.* at 870. In *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 538 (9th Cir. BAP 2005), the bankruptcy appellate panel determined that the clause made clear that to come within the definition, the payment must be "restricted to the securities trade and must be 'commonly used.'" *Id.*

■ Even where a broad interpretation has been ascribed to the term "settlement payment," it has been observed that the term had to be interpreted as it was "plainly understood within the securities industry." *See Kaiser II*, 952 F.2d at 1237; *see also, Official Comm. of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.)*, 288 B.R. 484, 492 (Bankr.N.D.Ohio 2003) (noting that the term settlement payment has been characterized as a technical word or term of art which requires reference to the industry usage of the term at the time of enactment); *Adler*, 263 B.R. at 475 (noting that it is clear that the provision is to be "defined with reference to the common understanding, practice and usage in the securities industry"). As such, to discern whether a payment is protected by the safe harbor provisions, a court must examine the operation of trades in the securities industry. *Grafton*, 321 B.R. at 538.

Recently, this Court has denied motions seeking to dismiss certain complaints filed by Enron concerning the safe harbor provisions. The Court found that a trial was necessary where an issue was presented as to whether a particular transfer qualified as a settlement payment that was commonly used in the securities trade. In *Bear, Stearns Int'l*, 323 B.R. 857, there were allegations that a corporation had purchased its own shares in violation of a state statute that rendered such transaction void. As a settlement payment is made to complete a securities transaction, it was determined that if the underlying transaction were void, there would be no securities transaction to complete from which a settlement payment to be protected could result. *Bear, Stearns Int'l*, 323 B.R. at 877. Therefore, a trial was necessary to determine whether the state's voiding statute had been violated. In *Enron Corp. v. J.P. Morgan Securities, Inc. (In re Enron Corp.)*, 325 B.R. 671 (Bankr. S.D.N.Y.2005), the Court concluded that a trial was necessary as to whether "certain payments made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents in the midst of coercion by the holders of the commercial paper resulting from public announcements [describing the company's financial crisis]" qualified as settlement payments commonly used in the securities trade. *J.P. Morgan*, 325 B.R. at 686. Moreover, as the payments were contrary to the parties' intentions at the time of the issuance of the offering documents, there were allegations that the transfers were made not to settle securities trades, but rather to prepay debt as a borrower may accelerate payments on the principal and interest due on a loan. *Id.*

■ In the instant matter, there is no allegation in the Complaint that Enron repurchased or redeemed its own equity or debt obligations prior to maturity. Nor are there any allegations that the different enterprises that were formed, including

CLO Holding and the CLO Trust, should be collapsed into Enron. Rather, Enron purchased the CLO Notes issued by the CLO Trust, an entity legally separate from Enron and the only entity with obligations on the CLO Notes. Indeed, the CLO Trust remained obligated on the CLO Notes even after their transfer to Enron.

Nor are there any allegations of state law violations that would void the underlying securities transaction and render it a nullity. If the securities transaction remains viable, then a payment commonly used in the securities trade for the purchase of securities would be a settlement payment subject to the protection of the safe harbor.

Enron argues that the payment it made to purchase the CLO Notes cannot be considered commonly used in the securities trade because it was made contrary to the offering documents in that it violated sections 12.12(b) and (c) of the indenture agreement (the "Indenture"). Enron, however, did not make that allegation in the Complaint. Rather, it was first addressed in their pleading opposing dismissal of the Complaint. More importantly, the sections of the Indenture cited by Enron do not concern the sale of CLO Notes to third-parties. Instead, those sections address the repayment priority afforded to the senior classes of holders of the CLO Notes, providing that a holder of a CLO Note may not receive repayment until senior holders of CLO Notes are paid in full. Here, the CLO Trust did not repurchase the CLO Notes, which would have implicated those terms of the Indenture. Rather, Enron, as a separate third-party, purchased the CLO Notes from its holders. Indeed, the transaction documents make clear that third-party purchases of the CLO Notes were contemplated and permissible. The Offering Circular distributed in connection with the CLO Note offering references representations and agreements concerning future transfers made by any third-party purchaser of the CLO Notes. In addition, the Indenture includes an approved "form" for any such transfer. Thus, had Enron contended in the Complaint that the purchase of the CLO Notes violated sections 12.12(b) and (c) of the Indenture, the Court, in considering the Indenture, would conclude that, absent any allegations concerning collapsing of the various entities' structure, those sections were not violated by Enron's purchase of the CLO Notes.

A settlement payment that is "made by or to," *inter alia*, a commodity broker, a stockbroker, a financial institution, or a securities clearing agency is protected by the safe harbor of section 546(e) of the Bankruptcy Code. 11 U.S.C. § 546(e). Inasmuch as FED.R.EVID. 201 provides that a court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned," this Court has relied on FED.R.EVID. 201 to establish the status of an entity as a stockbroker, securities clearing agency or financial institution as these statuses may be ascertained from the records of various public or quasi-public bodies. *See Bear, Stearns Int'l*, 323 B.R. at 869. The Defendants have presented excerpts from the records of various public or quasi-public bodies establishing that BSSC is a stockbroker and securities clearing agency, that Bear, Stearns is a stockbroker, and that Chase is a financial institution. All of the transactions involved transfers either to or from Chase and BSSC and/or Bear, Stearns.

As previously noted, in the securities industry, any transfer of cash or securities made to complete a securities transaction is considered a settlement payment. Enron acknowledges that it made the trans-

fer to the Defendants to purchase the CLO Notes. Enron, however, argues that it paid above market value for the CLO Notes. The Defendants counter that Enron's claim that it received less than reasonably equivalent value is an element of a constructive fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B). The language of section 546(e) includes the term "[n]otwithstanding [section] 548(a)(1)(B)." As such, the Defendants maintain that if a transfer by which a debtor pays above market value for a security is considered not "commonly used" and, therefore, not a settlement payment, then this term would be rendered meaningless because any constructive fraudulent transfers would not be exempt.

A divergence in the price paid from the market value, by itself, is ordinarily not sufficient to take a particular transaction out of the realm of one "normally regarded" as part of the settlement process unless the disparity between the payment made for the security and the market value was large enough to be said to "involve outright illegality or transparent manipulation" sufficient to warrant rejection of section 546(e) protection. *See Grafton,* 321 B.R. at 539 (noting that "decisions that involve outright illegality or transparent manipulation reject § 546(e) protection"). The allegations in the instant Complaint do not allege facts that involve "outright illegality or transparent manipulation."

It appears that as with the equity swap and commercial paper transactions that were the subject of the *J.P. Morgan* and *Bear, Stearns, Int'l* Opinions, the transactions here are examples of Enron apparently going into the market place and overpaying for the product it purchased to, among other things, protect its credit rating. Thereafter, the recipients of Enron's transfers raise the safe harbor of Bankruptcy Code section 546(e) as a defense to

the assertion of an avoidance action. While Enron may have had the same intent in the instant transactions as in the transactions involved in the cited Opinions, in the instant transactions that intent was carried out within the narrow confines of the security transactions. Therefore, although Enron may be able to establish that, in many ways, the safe harbor is being used as a sword and not as a shield for marketplace stability, as intended, the parties to the instant transactions are protected because their transactions did not involve outright illegality or transparent manipulation as was present in the earlier cases which, among other things, rendered the payments not commonly used in the securities industry.

## CONCLUSION

To qualify as a settlement payment protected from avoidance by section 546(e) of the Bankruptcy Code, the payment must be common in the securities trade. The Court concludes that even if the payments made for the purchase of the securities were above market value, the facts as alleged are not sufficient to take these payments out of the realm of settlement payments commonly used in the securities industry and to warrant rejection of the safe harbor protection. Therefore, the Defendants' motions to dismiss Count I, Count II and Count III of the Complaint as against them are granted.

Counsel for Bear, Stearns is to settle an order consistent with this Opinion.